**FILED**

**December 17, 2018**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 1:23 P.M. EASTERN**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT KNOXVILLE

| | |
|---|---|
| **DAVID LEATHERWOOD,** ) | Docket No. 2017-03-0758 |
| Employee, ) | |
| v. ) | |
| **MAYFIELD DAIRY FARMS, LLC,** ) | |
| Employer, ) | State File No. 30692-2017 |
| and ) | |
| **LIBERTY MUTUAL INSURANCE** ) | |
| **COMPANY,** ) | |
| Carrier. ) | Judge Pamela B. Johnson |

---

## COMPENSATION ORDER

---

This matter came before the Court for a Compensation Hearing on November 6, 2018. The issue is whether Mayfield Dairy Farms, LLC is liable for unauthorized medical expenses and, if so, for Mr. Leatherwood's attorney's fees and expenses. For the reasons below, this Court holds that Mr. Leatherwood established by a preponderance of the evidence that Mayfield is liable for the requested medical expenses but reserves the attorney's fees issue.

### History of Claim
*Stipulations*

David Leatherwood sustained an injury by accident arising out of the course and scope of his employment with Mayfield on April 21, 2017. He provided timely notice of his injury and received authorized medical treatment with Dr. Audrey Smith at American Family Clinic (AFC).

On April 24, Dr. Smith released Mr. Leatherwood without restrictions, and he returned to work for Mayfield for a period of time earning the same or greater wages as he earned before the injury. His average weekly wage was $348.84 resulting in a weekly compensation rate of $232.57.

1

## Factual Allegations
### *Injury*

Mr. Leatherwood worked part-time for Mayfield as a merchandiser. On April 21, 2017, he fell while stocking product, striking his back on a plastic crate and cutting his head. The same day, he reported the injury to his supervisor, Shawn McGuire, who instructed him to seek medical care at AFC. He denied receiving a panel of physicians.

Mayfield disputed Mr. Leatherwood's claim that he was not provided a panel. To support its contention, it introduced a panel containing the names of three physicians and three medical centers. The unsigned, undated panel listed neither Mr. Leatherwood's name, injury date, or contact information nor Dr. Smith or AFC as providers. Moreover, Mayfield introduced a Notice to Report for Drug Specimen Collection, which instructed him to report immediately to AFC for a post-accident drug screen.

### *Authorized Medical Treatment*

The same day, Mr. Leatherwood went to AFC and saw Dr. Audrey Smith. He reported that he fell while pushing a cart of empty milk crates. He indicated he fell on his bottom but scratched his right ribcage on the edge of another cart and a falling milk crate scratched his forehead, but he denied loss of consciousness. On physical exam, Dr. Smith noted that he suffered a superficial laceration to his right forehead, anterior right rib tenderness with a large abrasion from the scapular area to the lumbar area, and parascapular erythema. X-rays showed, "Questionable nondisplaced fracture lateral aspect right eighth rib." She diagnosed an open head wound, right rib fracture, and open wound of the right thoracic back. Dr. Smith assigned restrictions and told him to return in three days.

He did so and reported improvement. Dr. Smith noted his head and side wounds were "almost completely healed." She indicated that she no longer believed he fractured his rib, since he was pain free and had free range of motion. Dr. Smith released him to work without restrictions.

### *Unauthorized Emergency Room Treatment*

On May 2, eleven days after the injury, Mr. Leatherwood sought emergency care at Parkwest Medical Center (PMC). He reported he fell and struck his right forehead, right ribs, and mid-back. He also stated he briefly lost consciousness when he fell and suffered confusion since the fall. The intake sheet noted admitting diagnoses of chest pain and shortness of breath. After an examination and numerous diagnostic tests, the physician diagnosed back contusion and concussion injury from the fall and confirmed "TESTS ALL GOOD. NO SDH OR SKULL FX. NO RIB FRACTURE, PNEUMO.

NO ABD INJURY. LABS ALL GOOD." (Emphasis in original). Mr. Leatherwood incurred charges totaling $9,341.92 for this visit.

*Disputed Issue*

The parties dispute Mr. Leatherwood's unauthorized medical treatment and expenses incurred at PMC. Mr. Leatherwood claimed the treatment was necessitated by his fall at work, and thus Mayfield was liable for the expenses. Mayfield disagreed, asserting the treatment was unauthorized and unrelated to the work injury. It focused on AFC's April 24 release of Mr. Leatherwood to full duty with no follow-up and his return to work. It further asserted his explanation for seeking unauthorized care varied and lacked credibility.

*Mr. Leatherwood's Recorded Statement*

In his recorded statement taken by Mayfield's carrier, Mr. Leatherwood explained his reasons for seeking emergency care. He said he was very concerned that he suffered a possible concussion, and he remained worried about his lingering right-side pain. He was not confident that the clinic was going to provide him with answers, and he was closer to PMC than the clinic. He acknowledged that Mr. McGuire wanted him to return to Mayfield to complete paperwork and then go to the clinic, but he stated he was having difficulty driving and performing his job, and that he felt it better to seek treatment at PMC.

Additionally, Mr. Leatherwood discussed his April 24 release to full duty. He said AFC informed him that his type of injury took time to heal and nothing more could be done. He stated he remained open to returning to work, but within three to four days of doing so, he began having significant trouble working and he felt he needed additional treatment.

*Mr. Leatherwood's Affidavit*

In Mr. Leatherwood's affidavit supporting his Request for Expedited Hearing, he stated, "On May 2, 2017, I called my supervisor to report my severe pain and other developing issues and to tell him I was seeking further treatment immediately." He indicated his supervisor told him to report to the clinic. Consistent with his recorded statement, he declined because he believed it was in the best interest of others on the roads and himself to seek treatment at the closer emergency room. He did not feel he could safely drive to the clinic. He was concerned that he might have suffered a concussion.

*Mr. Leatherwood's Deposition*

In his deposition, Mr. Leatherwood addressed his AFC release to work full duty. He stated the AFC physician asked him how he was doing, and he responded, "[I]t hurt." He told her, "I don't feel that I can't go back to work or try to go back to work." The AFC physician replied, "Well, if you think you can do the job . . . let's go ahead and get you back."

After he returned to work, he testified that each day he began feeling more tired, his side hurt more, and he experienced difficulty driving and blackouts. On May 2, 2017, he experienced shortness of breath and pain in his chest and right side. He called his supervisors and told that he experienced confusion, had problems driving, and felt faint and weak. His supervisors asked if he could finish his route and return to Mayfield. He responded that he did not think he could make it back to the office and told Mr. McGuire he thought he should go to a closer hospital.

He denied experiencing these symptoms or missing work at his other employment. He also denied seeking treatment following his emergency room visit. However, he testified he continued to experience rib pain.

*Mr. Leatherwood's Hearing Testimony*

At the hearing, Mr. Leatherwood testified that he sought emergency care because he felt faint, short of breath, fatigued, and increasing right-side pain, and he experienced difficulty driving. He indicated that he left Mr. McGuire a voicemail advising that he needed to discuss his route. In the voicemail, he referenced his side where he struck his rib, stated it was hard for him to catch his breath, and indicated he needed help. When he spoke with his supervisor, Mr. McGuire asked him to return to Mayfield and then go to AFC. Mr. Leatherwood testified that, at the time of the telephone call, he believed he was closer to PMC than AFC. He again explained he sought treatment at PMC because he was overwhelmed by his symptoms and concerned that he suffered internal injuries. He thought if he went to AFC, then he would be required to wait and fill out paperwork. In the couple of days leading up to May 2, he stated he had driven off the road and blacked out.

On cross examination, Mr. Leatherwood admitted the PMC sign-in sheet noted that his primary reason for seeking treatment was "Can't Breath – hurting[.]" He acknowledged the intake sheet noted shortness of breath and chest pain, but he countered that different individuals completed the paperwork, and the same document noted that his symptoms were employment-related.

Mr. Leatherwood also admitted that he saw his primary care physician (PCP) on April 27, 2017, for a three-month follow up regarding unrelated conditions. The notes

reflected he told his PCP that he fell at work, hurt his back, and fractured a rib, but he was doing well otherwise.

He further admitted that he attended a previously scheduled sleep consultation on May 3. At the consultation, he reported he snored and experienced excessive daytime sleepiness for many years but his symptoms were worsening. He additionally reported he worked two jobs and experienced more difficulty focusing at work and some difficulty breathing. He advised the sleep center that he went to the emergency room the previous evening but he did not report the recent work injury and no acute abnormalities were shown.

Mayfield's counsel presented Mr. Leatherwood with copies of two Facebook posts dated April 29. One post depicted a wooded lot with a caption, "Our new home with so much to do. Hugh (sic) wooded lot and chainsaw running today[.]" The second post showed a large pile of cut tree branches and captions stating, "Cleaning up the backyard!" He explained his wife posted the photos and captions and performed the yard work.

*Mr. McGuire's Hearing Testimony*

Mr. McGuire testified that Mr. Leatherwood worked every day after his April 24 release. He denied that Mr. Leatherwood called him to report his symptoms; he only received the May 2 voicemail. On cross examination, Mr. McGuire acknowledged Mayfield's policy would not allow an employee to operate a vehicle while on the clock if that employee were experiencing symptoms similar to those reported by Mr. Leatherwood. Mr. McGuire responded, "To answer your question on company policy, no, we would not want an employee working under those conditions."

**Medical Testimony**
*Dr. Kennedy*

At Mr. Leatherwood's request, Dr. William Kennedy reviewed the AFC and PMC records to determine whether Mr. Leatherwood's emergency room visit was reasonable, necessary, and caused by the work injury. Dr. Kennedy determined, "[I]t was both appropriate and reasonable and necessary for Mr. Leatherwood to seek treatment in the emergency department . . . arising from and attributable to the work-related injuries that he suffered[.]" Considering other potential causes, Dr. Kennedy testified, "[I]t was my opinion that the necessity of that testing and treatment . . . was primarily caused, with greater than 50 percent contribution, to that cause by the work-related incident of April 21, 2017."

Dr. Kennedy testified that he was familiar with the charges of emergency departments in east Tennessee, regularly sees charges by other emergency physicians in

the some locality, and routinely testifies as to the reasonableness and necessity of these charges. Regarding the PMC charges and treatment, Dr. Kennedy testified, "[T]hey were both reasonable and necessary and they were also caused by [the] work-related incident of April 21, 2017." Dr. Kennedy explained that it was appropriate to conduct the CT scans due to Mr. Leatherwood's history of the work injuries to his head and right side and the potential subdural hematoma and/or hemopneumothorax.

He testified that he readily reached the conclusion that the head CT scan was appropriate due to the possibility of an evolving subdural hematoma from the trauma. (Dr. Kennedy Depo, p. 21). He detailed further the importance of the CT scan of the chest, abdomen, and pelvis, stating a hemopneumothorax, pulmonary embolus, or post-traumatic congestive heart failure can evolve over time following a trauma. He concluded that these tests were ordered not only on Mr. Leatherwood's complaints but also on the objective findings of a blow to the head and the injury to the right side of his chest. (*Id.*, pp. 59-61).

Dr. Kennedy admitted that he did not physically examine or interview Mr. Leatherwood. Similarly, he admitted that he did not review records from his primary care physician, and he had no knowledge of his other employment, medical conditions, treatment, or medications. When asked whether he considered causes other than the work injury necessitating emergency care, Dr. Kennedy testified, "That is the only cause that I considered simply because that was the only cause that came to my attention in the records that were available to me[.]"

*Dr. Smith*

Dr. Audrey Smith testified concerning her examinations of Mr. Leatherwood on April 21 and 24 and offered her opinions concerning the reasonableness, necessity, and causal need for his May 2 emergency care. She testified that Mr. Leatherwood stated at the April 24 visit that he was better and ready to return to work. She additionally said he did not complain of back, rib or chest pain, shortness of breath, headaches, or confusion. She stated, "I released him to full duty, and my opinion was he did not need any further medical treatment."

Concerning the emergency care, Dr. Smith testified she reviewed the PMC records and determined that Mr. Leatherwood's work injury did not primarily cause the complaints that he presented with at PMC. She likewise stated that the work injury did not primarily cause the need for the tests conducted at the emergency room. However, she admitted she did not examine Mr. Leatherwood on May 2, and she could not testify as to what Mr. Leatherwood's condition was on that date.

Dr. Smith admitted that she neither practiced emergency medicine nor was she licensed in it. Similarly, she confirmed she was not qualified to testify whether the PMC

6

physicians performed Mr. Leatherwood's care within the recognized standards of emergency care. She also denied any criticism of the PMC physicians for the care and treatment provided to Mr. Leatherwood. Dr. Smith also confirmed that a doctor should not merely rely upon prior exams of the patient when determining what is reasonable and necessary for diagnosis and treatment at the patient's later presentation. She agreed it was the duty of a doctor to consider all potential conditions and their differential diagnoses and then consider the most serious conditions to rule out first.

*Attorney's Fees*

In addition to seeking payment of his bills for the emergency care, Mr. Leatherwood asked the Court to award attorney's fees under Tennessee Code Annotated section 50-6-226(d)(1)(B). The Court grants the parties' request that it defer deciding the issue until they submit post-trial briefs and affidavits and the Court schedules the matter for oral argument.

**Findings of Fact and Conclusions of Law**

Mr. Leatherwood has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions*, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2017). Here, the benefits sought are for unauthorized medical treatment.

Tennessee's workers' compensation law does not impose liability upon the employer for unauthorized medical treatment unless the employee proves: "(1) justification, i.e. a 'reasonable excuse,' for not consulting with h[is] employer before incurring medical expenses, and (2) the 'necessity and reasonableness' of the unauthorized medical care." *Gray v. Wingfoot Commer. Tire Sys.*, No. W2017-00380-SC-WCM-WC, 2018 Tenn. LEXIS 239, at *19-20 (May 21, 2018) (internal citations omitted). Additionally, Tennessee Code Annotated section 50-6-204 "makes it clear that the intent [of the Legislature] . . . was for the employee to certainly do no less than consult his employer before incurring the expenses called for by that statute if the employee expects the employer to pay for it. The opposite would seem to be against public policy." *Buchanan v. Mission Ins. Co.*, 713 S.W.2d 654, 658 (Tenn. 1986) (internal citations omitted).

Applying these principles, the Court first addresses whether Mr. Leatherwood demonstrated by a preponderance of the evidence that he consulted with Mayfield before seeking emergency care or otherwise proved a justification for seeking unauthorized care.

7

The Court finds Mr. Leatherwood consistently testified by affidavit, deposition, and at the hearing, that he informed Mr. McGuire on May 2 that he experienced difficulty focusing and driving, and increased pain in his side. When his supervisor asked him to come to Mayfield and then go to AFC, he explained that he was worried and believed it was wiser to seek emergency care at the closer PMC than at AFC. In contrast, Mr. McGuire denied that Mr. Leatherwood spoke to him concerning his condition on May 2 with the exception of the voicemail. However, he admitted that Mayfield's policy would not permit an employee working who was experiencing the symptoms Mr. Leatherwood alleged. The Court holds Mr. Leatherwood satisfied his burden and established that he consulted Mayfield before seeking care at PMC. The Court further holds that Mr. Leatherwood's decision to seek emergency care was justified considering the severity of the symptoms he experienced on May 2.

The Court next addresses whether his emergency care was reasonable, necessary, and related to the work injury. The PMC records reflect Mr. Leatherwood reported he fell and struck his forehead, ribs, and mid-back and suffered confusion since the fall. The intake sheet noted an admitting diagnosis of chest pain and shortness of breath related to his employment. After an examination and numerous diagnostic tests, the physician diagnosed back contusion and concussion injury from the fall.

Both parties submitted the PMC records for physician review to determine the reasonableness and necessity of the emergency care as well as to address the causal relationship to the work injury. Dr. Kennedy testified that Mr. Leatherwood's treatment and resulting charges were reasonable, necessary, and caused by [the] work-related incident. Dr. Kennedy explained that it was appropriate to conduct the CT scans due to Mr. Leatherwood's history of the work injuries to his head and right side in light for the potential subdural hematoma and/or hemopneumothorax. Dr. Kennedy found the diagnostic testing was ordered not only on Mr. Leatherwood's subjective complaints but also on the objective findings of a blow to the head and the injury to the right side of his chest. When asked whether he considered causes other than the April 21 work injury, Dr. Kennedy testified, "That is the only cause that I considered simply because that was the only cause that came to my attention in the records that were available to me[.]"

In contrast, Dr. Smith determined that Mr. Leatherwood's work injury did not primarily cause the complaints he presented with at PMC or the need for its testing. However, she admitted that she was neither qualified to testify whether the PMC physicians performed Mr. Leatherwood's care within the recognized standards of emergency care nor offered criticism of the PMC physicians for the treatment they provided. Of importance, she agreed it was the duty of a doctor to consider all potential conditions and their differential diagnosis and then to consider the most serious conditions to rule out first.

8

It is within the Court's discretion to conclude that the opinion of one expert should be accepted over that of another expert as having more probable explanation of a disputed issue. *Ledford v. Mid Georgia Courier, Inc.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 28, at *7-8 (Jun. 4, 2018) (internal citations omitted). In evaluating expert medical opinions, the trial court may consider, among other things, the qualifications of the experts, the circumstances of their evaluation, the information available to them, and the evaluation of the importance of that information by other experts. *Id.* No presumption of correctness attaches to Dr. Smith's opinion because Mr. Leatherwood did not select her from a panel under Tennessee Code Annotated section 50-6-204.

Regarding the experts' qualifications, the Court finds this factor favors Dr. Kennedy. He is board-certified as an orthopedic physician and independent medical examiner. He testified he had experience in emergency care and with its customary charges. In comparison, Dr. Smith testified she is board-certified in family practice, and her curriculum vitae reflected her experience was limited to family practice and occupational medicine. Additionally, she testified she was not qualified to testify whether the PMC physicians performed Mr. Leatherwood's care within the recognized standards of emergency care.

The Court finds the circumstances of their evaluations do not favor either doctor. Both reviewed similar information and focused on the PMC records. Both were asked to review the PMC records to determine whether the treatment was reasonable, necessary, and causally related to the work injury.

Here, the case turns on the information available to the physicians and the importance of that information. The Court finds Dr. Kennedy's opinion more persuasive. He provided detailed explanation concerning the reasonableness and necessity of the treatment and charges and the causal relationship to Mr. Leatherwood's work injury. He explained with great specificity the rationale behind PMC's testing. Dr. Smith admitted she had no criticism of the PMC physicians' treatment of Mr. Leatherwood and agreed that it was a physician's duty to consider all potential conditions and their differential diagnosis and then to consider the most serious conditions to rule out first.

Accordingly, the Court holds Mr. Leatherwood satisfied his burden and demonstrated the care at PMC was reasonable, necessary, and related to his work injury. Therefore, the Court holds Mayfield is liable for these charges.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mayfield shall pay Mr. Leatherwood's charges totaling $9,341.92.

2. The issue of Mr. Leatherwood's attorney's fees is reserved at this time. The parties may file additional briefs and supporting affidavits limited to this issue

9

within the following deadlines: Mr. Leatherwood's deadline is ten business days from entry of this order, or no later than January 4, 2019; and Mayfield's deadline is fifteen business days following entry of this order, or no later than January 11, 2019. The parties shall appear by telephone (toll-free 855-543-5041) for argument on **January 17, 2019**, at **10:00 a.m. Eastern Time**.

3. This Order shall not become final until the order on attorney's fees is entered.

**ENTERED December 17, 2018.**

**PAMELA B. JOHNSON, JUDGE**
**Court of Workers' Compensation Claims**

## APPENDIX

Technical record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. Order to Comply with 0800-025-21-.16(5)(c)
5. Docketing Notice for on-the-Record Determination
6. Employer's Position Statement
7. Employer's Notice of Objection to Admissibility of Medical Expenses
8. Expedited Hearing Order
9. Scheduling Hearing Order
10. Agreed Order to Extend Discovery Deadlines
11. Employee's Notice of Filing Deposition Transcript of Dr. William Kennedy
12. Employer's Notice of Filing Deposition of Dr. Audrey Smith
13. Joint Pre-Compensation Hearing Statement
14. Employer's Compensation Brief
15. Employer's Witness and Exhibit List
16. Post-Discovery Dispute Certification Notice
17. Employee's Motion to Accept Employee's Table of Contents of Medical Records and Billing Records
18. Subpoena served on Lori Leonard, Department of Health
19. Subpoena served on Medical Records Custodian, Parkwest Medical Center
20. Employer's Objection to Admissibility of Medical Bills
21. Employee's Response to Employer's Objection to Admissibility of Medical Bills
22. Employer's Response to Affidavit of Attorneys' Fees
23. Employee's Reply to Employer's Objection to Employee's Fee Application

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

Exhibits:

1. Employer's Exhibits
   - Medical Records – American Family Care
   - First Report of Work Injury
   - Workers' Compensation File
   - Attendance Records
   - David Leatherman's Affidavit
   - David Leatherman's Recorded Statement
2. PMC Medical Records
3. Photographs of Injury
4. Wage Statement
5. David Leatherwood Deposition Transcript
6. Dr. William Kennedy Deposition Transcript
7. Dr. Audrey Smith Deposition Transcript
8. Tennessee Department of Health Dr. Audrey M. Smith Records
9. Voicemail Recording
10. Late-Filed Affidavit of Attorneys' Fees and Costs
11. University of Tennessee Medical Center April 27, 2017 Office Visit Note
12. PMC Emergency Sign-In Sheet
13. May 3, 2017 Sleep Consultation
14. Facebook posts
15. David Leatherwood's Discovery Responses

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Compensation Order was sent to the following recipients by the following methods of service on December 17, 2018.

| Name | Certified Mail | Fax | Email | Service sent to: |
|------|----------------|-----|-------|------------------|
| Joshua Bond Employee's Attorney | | | X | jbond@hdclaw.com |
| Laurenn S. Disspayne, Employer's Attorney | | | X | ldisspayne@manierherod.com |

PENNY SHRUM, COURT CLERK
wc.courtclerk@tn.gov

12



## COMPENSATION HEARING NOTICE OF APPEAL

Tennessee Division of Workers' Compensation

www.tn.gov/labor-wfd/wcomp.shtml

wc.courtclerk@tn.gov

1-800-332-2667

Docket #: _____

State File #/YR: _____

_____

**Employee**

v.

_____

**Employer**

### Notice

Notice is given that _____

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the order(s) of the Court of Workers' Compensation Claims at _____

_____ to the Workers' Compensation Appeals Board.

[List the date(s) the order(s) was filed in the court clerk's office]

**Judge**_____

### Statement of the Issues

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

### List of Parties

**Appellant (Requesting Party):**_____ At Hearing: ☐ Employer ☐ Employee

Address:_____

Party's Phone:_____ Email:_____

Attorney's Name:_____ BPR#: _____

Attorney's Address:_____ Phone: _____

Attorney's City, State & Zip code:_____

Attorney's Email:_____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____  SF#: _____  DOI: _____

## Appellee(s)

**Appellee (Opposing Party):**_____At Hearing:☐Employer☐Employee

Appellee's Address: _____

Appellee's Phone: _____Email:_____

Attorney's Name: _____ BPR#: _____

Attorney's Address: _____ Phone: _____

Attorney's City, State & Zip code: _____

Attorney's Email: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I,_____, certify that I have forwarded a true and exact copy of this Compensation Hearing Notice of Appeal by First Class, United States Mail, postage prepaid, to all parties and/or their attorneys in this case in accordance with Rule 0800-02-22.01(2) of the Tennessee Rules of Board of Workers' Compensation Appeals on this the_____day of_____, 20___.

[Signature of appellant or attorney for appellant]        _____

Attention: This form should only be used when filing an appeal to the Workers' Compensation Appeals Board. If you wish to appeal a case to the Tennessee Supreme Court, please utilize the form provided by the Court which can be found on their website at the following address: http://www.tncourts.gov/sites/default/files/docs/notice_of_appeal_-_civil_or_criminal.pdf



<u>Compensation Hearing Order Right to Appeal</u>:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____   2. Address: _____

3. Telephone Number: _____   4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____   Relationship: _____

_____   Relationship: _____

_____   Relationship: _____

_____   Relationship: _____

6. I am employed by: _____

   My employer's address is: _____

   My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                                                                RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental   $ _____ per month

Groceries      $ _____ per month    Telephone     $ _____ per month

Electricity      $ _____ per month    School Supplies $ _____ per month

Water      $ _____ per month    Clothing     $ _____ per month

Gas      $ _____ per month    Child Care     $ _____ per month

Transportation   $ _____ per month    Child Support   $ _____ per month

Car      $_____ per month

Other      $ _____ per month (describe: _____ )

10. Assets:

Automobile      $ _____    (FMV) _____

Checking/Savings Acct. $ _____

House      $ _____    (FMV) _____

Other      $ _____    Describe: _____

11. My debts are:

| Amount Owed | To Whom |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____

APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____ , 20 _____ .

_____

NOTARY PUBLIC

My Commission Expires: _____